IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

MICHAEL ELLIS,

                Plaintiff,

v.                                    CIVIL ACTION NO.   2:15-cv-05698

KANAWHA COUNTY PUBLIC LIBRARY,

                Defendant.

**MEMORANDUM OPINION AND ORDER**

Before the Court is Defendant Kanawha County Public Library's ("the Library") Motion to Dismiss the Amended Complaint (ECF No. 22).   As Plaintiff Michael Ellis proceeds pro se, this action was previously referred to Magistrate Judge Dwane L. Tinsley for submission of Proposed Findings and Recommendation (the "PF&R").   Magistrate Judge Tinsley submitted his PF&R on July 27, 2016, finding the Amended Complaint insufficient under Federal Rule of Civil Procedure 8(a) and recommending that the Court grant the Motion to Dismiss in its entirety. (ECF No. 32.)   The PF&R invited the parties to submit objections by August 15, 2016.

In lieu of objections, Plaintiff filed a Motion for Leave to Amend Complaint with a proposed amended pleading attached (ECF No. 34).   The Library responded with a Motion to Strike (ECF No. 35), arguing that Plaintiff's motion to amend was not responsive to the PF&R, that the deadline for filing amended pleadings has passed, and that amendment at this late hour will cause unfair prejudice.   For the reasons that follow, the Court **DECLINES TO ADOPT** the PF&R, **GRANTS IN PART** and **DENIES IN PART** the Motion to Dismiss (ECF No. 22), and

**REREFERS** this action to Magistrate Judge Tinsley, *inter alia*, for consideration of Plaintiff's

Motion for Leave to Amend and the Library's Motion to Strike.

## I.     BACKGROUND

On April 21, 2015, Plaintiff Michael Ellis, an African-American and former part-time

Library employee, filed suit in West Virginia state court against the Library and Library Director

Alan Englebert.[1]   Plaintiff's original Complaint was one paragraph in length and summarily

alleged:

> Pursuant to W.V. Code 5-11-13b and NOTICE of Right to Sue letter I am
> authorized to institute a civil action based on my Human Rights Claim EEOC-17J-
> 2014-00067 against Kanawha County Public Library[.]   I am requesting a Jury
> Trial to be set after July 2015[.] Discrimination Title VII wrongfull [sic]
> Termination [and] Retaliation [and] Race.

(Compl., ECF No. 1-1 at 2.)   The Library removed the action to this Court on May 5, 2015.   The

following day, the Library moved to dismiss Plaintiff's Complaint for failure to state a claim under

Federal Rule of Civil Procedure 12(b)(6).   (ECF No. 4.)   On May 11, 2015, Plaintiff moved for

leave to amend the Complaint and submitted an amended pleading in support thereof.   (ECF No.

6.)   The Library responded in opposition, claiming Plaintiff's proposed amendment would not

correct the deficiencies present in the Complaint.   The Magistrate Judge held a status conference

on December 1, 2015.   There, the Library agreed to withdraw its pending motion to dismiss in

order to provide Plaintiff an opportunity to amend his Complaint.   (*See* ECF No. 15 at 2.)

Following the status conference, the Magistrate Judge entered an Order and Notice denying

as moot the Library's then-pending Motion to Dismiss and granting Plaintiff leave to file an

amended pleading by January 8, 2016.   (*Id.*)   The Magistrate Judge directed Plaintiff to conform

---

[1] By Amended Complaint filed January 7, 2016, Plaintiff voluntarily dismissed his claims against Mr.
Englebert.   (ECF No. 18.)

2

his amendment to Rules 8, 9, and 10 of the Federal Rules of Civil Procedure by "stat[ing] any and all claims upon which he wishes to proceed, including the jurisdictional basis for each claim and naming all Defendants upon whom each claim is brought and stating in a short and plain statement, the facts supporting each of those claims."   (*Id.* at 2.)   Plaintiff filed the Amended Complaint on January 7, 2016.   He again alleged violations of Title VII, including "wrongful termination," hostile work environment, retaliation, and discrimination on the basis of race, and added common law claims for fraud and "intentional mental anguish."   (Am. Compl., ECF No. 18.)   The Library filed a second motion for Rule 12(b)(6) dismissal on January 11, 2016, which remains pending. In the PF&R, the Magistrate Judge finds the Amended Complaint fails to state a claim and recommends this Court grant the Motion to Dismiss.

## II.   LEGAL STANDARDS

### A.   Review of Magistrate Judge's PF&R

The Court is required to "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C).   However, the Court is not required to review, under a de novo or any other standard, the factual or legal conclusions of the magistrate judge "when neither party objects to those findings." *Thomas v. Arn*, 474 U.S. 140, 150 (1985).   The Court also need not conduct a de novo review when a plaintiff "makes general and conclusory objections that do not direct the Court to a specific error in the magistrate's proposed findings and recommendations."   *Id.*

Objections to the PF&R in this case were due August 15, 2016.   Plaintiff has not filed objections, and his Motion for Leave to Amend does not make the least mention of the PF&R, much less point to any specific error therein.   Nevertheless, the Court finds the Magistrate Judge's

analysis in the PF&R gives short shrift to Plaintiff's claims.   The Court therefore declines to adopt the PF&R's analysis in favor of its own analysis of the sufficiency of Plaintiff's claims.

   **B.**  *Motion to Dismiss*

   A pleading that states a claim for relief must, *inter alia,* contain "a short and plain statement of the claim showing that the pleader is entitled to relief."   Fed. R. Civ. P. 8(a)(2).   Allegations "must be simple, concise, and direct" and "no technical form is required."   Fed. R. Civ. P. 8(d)(1). A motion to dismiss for failure to state a claim upon which relief may be granted tests the legal sufficiency of a civil complaint.   Fed. R. Civ. P. 12(b)(6).   In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), the Supreme Court held that a case should be dismissed for failure to state a claim upon which relief can be granted if, viewing the well-pleaded factual allegations in the complaint as true and in the light most favorable to the plaintiff, the complaint does not contain "enough facts to state a claim to relief that is plausible on its face."   *Id.* at 570.   While the complaint need not assert "detailed factual allegations," it must contain "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action."   *Id.* at 555.

   In *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Supreme Court elaborated on its holding in *Twombly*.   The Court wrote:

> Two working principles underlie our decision in *Twombly*. First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. [*Twombly,* 550 U.S.] at 555 (Although for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true, we "are not bound to accept as true a legal conclusion couched as a factual allegation" . . . ).   Rule 8 . . . does not unlock the doors of discovery for a Plaintiff armed with nothing more than conclusions. Second, only a complaint that states a plausible claim for relief survives a motion to dismiss.   *Id.* at 556.

556 U.S. at 678–79.   A court decides whether this standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer that "the defendant is liable for the misconduct alleged." *Id.*   In other words, the factual allegations (taken as true) must "permit the court to infer more than the mere possibility of misconduct." *Id.*   A plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level," thereby "nudg[ing][the] claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 555, 570.   "[D]etermining whether a complaint states a plausible claim is context-specific, requiring the reviewing court to draw on its experience and common sense." *Iqbal*, 556 U.S. at 663–64.

The Court is required to liberally construe pro se complaints. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).   "[A] pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Id.* (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)).   This liberality is particularly appropriate where, as here, the pro se complaint raises civil rights claims. *Jehovah v. Clarke*, 798 F.3d 169, 176 (4th Cir. 2015) (citing *Smith v. Smith*, 589 F.3d 736, 738 (4th Cir. 2009)).   Still, the Court may not "rewrite a petition to include claims that were never presented," *Parker v. Champion*, 148 F.3d 1219, 1222 (10th Cir. 1998), or "construct a party's legal arguments for him," *Small v. Endicott*, 998 F.2d 411, 417–18 (7th Cir. 1993) (citation omitted). *See also Campbell v. Air Jamaica Ltd.*, 760 F.3d 1165, 1168–69 (11th Cir. 2014) ("[E]ven in the case of pro se litigants this leniency does not give a court license to serve as de facto counsel for a party, or to rewrite an otherwise deficient pleading in order to sustain an action." (emphasis and citation omitted)).

5

### III.    DISCUSSION

The Amended Complaint is, without question, difficult to decipher.  Its twelve single-spaced pages consist of rambling, largely unnumbered paragraphs.   After naming the Library as a defendant, the pleading begins with the heading "Plaintiffs [sic] Claim: Race Discrimination; Title VII," followed by the words "1. Wrongful Termination Hostile Work Environment."   Since Plaintiff uses a numerical designation to identify this claim, one might expect him to continue this practice throughout his pleading.   Unfortunately, this is not the case.   Plaintiff proceeds to number certain paragraphs seemingly at random, making it nearly impossible to identify his causes of action with precision.    Nevertheless, the Court can discern the following claims: race discrimination based on termination and an allegedly discriminatory employer policy (ECF No. 18 at 2); hostile work environment (*id.*); retaliation based on suspension and denial of desk duty (*id.* at 3–4); discriminatory suspension (*id.* at 4); retaliation in work schedule (*id.* at 5); "intentional mental anguish," (*id.* at 5), which the Court construes as an intentional infliction of emotional distress claim; and fraud (*id.* at 10).[2]

Neither the Library, in its Motion to Dismiss, nor the Magistrate Judge, in the PF&R, so much as touches on the substance of Plaintiff's claims.   The Library's principal objection to the Amended Complaint is that it is not "divide[d] into numbered paragraphs with discrete sets of facts and into specific counts" and does not "delineate clearly the cause of action that [Plaintiff] intends to pursue."   (ECF No. 23 at 3.)   Following the Library's lead, the Magistrate Judge found that

---

[2] Omitted from this list are certain allegations that, while numbered and set off like the above-referenced causes of action in bold, capitalized text, do not appear to state cognizable causes of action.   These include numbered paragraph six, "Meeting with Assistant Library Director Linda Miller," and numbered paragraph nine, "Kanawha County Public Library Managers & Directors."   Plaintiff also alleges at the conclusion of his Amended Complaint that "I have 2 more claims and will call 2 witnesses [sic] for my case."   (ECF No. 18 at 10.)   Of course, the Court cannot evaluate the sufficiency of claims that are not alleged.

the Amended Complaint's "paragraphs are not short and plain statements as contemplated by Rule 8." (ECF No. 32 at 8.) He further reasoned that "the Amended Complaint in its present form does not allow the Defendant to figure out what legal claims the Plaintiff is making and whose conduct caused his injuries and damages." (*Id.*) Though Plaintiff's Amended Complaint certainly is not a model of clarity, the Court finds that those claims discernable from the Amended Complaint, identified above, deserve more thorough consideration.

### A.   *Race Discrimination in Termination, Suspension, and Computer Policy*

Title VII makes it unlawful for an employer to "discharge any individual, or otherwise . . . discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e-2(a)(1). "[T]the elements of a prima facie case of discrimination under Title VII are: (1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class." *Coleman v. Maryland Ct. of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010), *aff'd sub nom.*, 132 S. Ct. 1327 (2012).

However, a plaintiff need not plead the elements of a prima facie case of discrimination to survive a motion to dismiss. *McCleary-Evans v. Md. Dep't of Transp.*, 780 F.3d 582, 585 (4th Cir. 2015) (citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002)). Instead, it is incumbent on the plaintiff to "allege facts to satisfy the elements of a cause of action created by [the] statute." *Id.* (citing 42 U.S.C. § 2000e–2(a)(1)). Merely pleading allegations that are "*consistent* with discrimination" will not suffice—the plaintiff must allege facts supporting a reasonable inference that his employer was motivated by bias. *Id.* at 586 (emphasis in original). Thus, if an employee claims to have suffered an adverse employment action, he must plead facts to raise a plausible inference that he suffered the adverse action "*because of* [his] race." *Id.* at

7

585 (emphasis in original).   The Fourth Circuit has defined an adverse employment action as "a discriminatory act which 'adversely affects the terms, conditions, or benefits of the plaintiff's employment.'"   *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir. 2004) (quoting *Von Gunten v. Maryland*, 243 F.3d 858, 865 (4th Cir. 2001)).

The Court summarizes below those allegations that appear to relate to Plaintiff's substantive claims of race discrimination.   The Amended Complaint opens with a description of a computer use policy adopted by the Library during Plaintiff's term of employment.   It alleges that Plaintiff's manager established a policy that limited the use of Library computers by Library staff during work hours.   (ECF No. 18 at 3.)   This policy permitted employees use of the computers only during their breaks, with an exception for employees who required use of the computers to conduct business on behalf of the Library.   Plaintiff alleges that the policy was discriminatory in its application because the white employees were permitted to use the computers, allegedly because they had official business to perform, while the black employees were not. Plaintiff avers that the Library's assertion that the white staff "had to do work [on the computers] for games and events" was untrue, since these events "were only held every few months."   (ECF No. 18 at 3.)

Plaintiff claims that he was later suspended for voicing concern about this policy.   The suspension was imposed following a November 28, 2012 staff meeting, during which Plaintiff alleges the following events occurred:

> At the meeting when the restrictive policy of internet use was being clarified to the staff members at the meeting it was verbally said by branch m[anager] Dana [S]mook the 2 white staff members could use the internet during all work hours. When I tried to explain this was unfair and discriminatory against us 3 black coworkers the m[anager] refused to discuss the issue and said I will speak with you in private.   I tried to explain these meetings are for the discussions and refused to speak about it and when I tried to ask another question about the unfair policy and

> that NO OTHER LIBRARY BRACH [sic] HAS EVER HAD THIS
> DISCRIMATORY [sic] POLICY AND DOES NOT HAVE! I WAS ASKED TO
> LEAVE THE MEETING! After the meeting a call came from Human Resources
> m[anager] Marsha Alford and said I was suspended.

(*Id.* at 4.)   Plaintiff alleges that he was "unfairly suspended for seven days" and that "there was
no reason for the suspension."   (*Id.*)

Plaintiff's termination occurred several months later.   According to the Amended
Complaint, on July 1, 2013, Plaintiff reported to work to find an "extremely large amount of books
on the shelves to be returned to the current locations."   (ECF No. 18 at 6.)   Four other coworkers
and the manager were also on duty.   Plaintiff avers that he realized that "this obviously was a
staged event."   (*Id.*)   Plaintiff states that he "had made previous complaints to the branch
m[anager] about staff members not doing their work shelfing [sic] books."   (*Id.*)   Nonetheless,
he "kindly shelved ALL the books by [himself] while the 3 white staff members sat at computers
on the internet."   (*Id.*)   After completing the shelving, Plaintiff joined his coworkers in the staff
area and sat down.   He alleges that the branch manager then asked him to shelve five remaining
DVDs.   Plaintiff refused, arguing that shelving DVDs was not his responsibility.   (*Id.* at 7.)   The
Amended Complaint continues:

> I was told by Branch m[anager] Dana Smook that since I refused to shelf [sic]
> DVDs I was suspended and ask[ed] to leave the Library.   I asked her to write down
> why I was being suspended but SHE REFUSED TO PUT IT IN WRITING. . . . I
> asked the branch m[anager] to call [assistant] director Linda Miller she acted like
> she called and said she could not reach her.   I asked her to call Director Alan
> Englebert she acted out the call and said she could not reach him.   I suggested we
> wait to contact someone or she could write it on paper why I was being asked to
> leave.   She insisted I leave and I suggested she call another m[anager] or that she
> could call the police and that way I atleast [sic] could have a true report of why I
> was being asked to leave the library. Branch m[anager] spoke to human resource
> m[anager] Marsha Alford for several minutes but I was not allowed to speak with
> her.   The police were called and I left the premises.

(*Id.* at 8–9.)

9

These allegations appear to allege three substantive race discrimination claims based on the computer policy itself and Plaintiff's subsequent suspension and termination.   To begin with the computer policy, Plaintiff does not provide much detail describing the significance of computer use to his job, and the collateral consequences, if any, that followed, from the limitation of this privilege.   However, the Court finds that the freedom to use Library computers during work hours can reasonably be construed as a "privilege of employment," the revocation of which could be materially adverse to Plaintiff.   Plaintiff also alleges that the Library withheld computer privileges from black employees on account of their race, thus supplying the essential link between the adverse employment action and racial motivation.   Plaintiff's Title VII claim based on this objectionable computer policy will proceed.

Turning to Plaintiff's claims for race-based suspension and termination, the Court finds that Plaintiff fails to state a claim.   Though both a suspension and termination can qualify as an adverse employment action,[3] Plaintiff's pleading does not give rise to a plausible inference that Plaintiff was terminated or suspended *because of* his race.   *McCleary-Evans*, 780 F.3d at 585. According to Plaintiff's own description, he compelled the adverse action in each case by acting belligerent, uncooperative, and disruptive to the orderly operation of the Library.   In the case of his termination, for example, Plaintiff flatly refused to carry out his manager's reasonable request and proceeded to bicker with her over his job responsibilities.   There is simply no "plausible basis

---

[3] Depending on its conditions, a suspension may or may not qualify as an adverse employment action. Title VII prohibits discrimination in hiring, firing, and "compensation, terms, conditions, or privileges of employment."   § 2000e–2(a)(1).   A suspension is neither a refusal to hire nor a termination, and Plaintiff has not alleged facts that the suspension had any effect on his pay or caused him economic harm.   *See Wilson v. Mabus*, 65 F. Supp.3d 127, 132–33 (D.D.C. 2014) (dismissing race discrimination claim where plaintiff failed to show "objectively tangible harm" following from his suspension).

for believing . . . that race was the true basis for [his] termination." *Coleman*, 626 F.3d at 191 (dismissing employee's race discrimination claim on these grounds). And in the case of his suspension, while Plaintiff's allegations may give rise to a retaliation claim, *see infra*, they do not create an inference that Plaintiff was suspended because of his race. Absent a rational connection to race, the Amended Complaint's allegations of race discrimination based on the suspension and termination do not rise above speculation. Plaintiff's claims for race based termination and suspension are hereby **DISMISSED**.

### B.   *Hostile Work Environment*

A plaintiff states a claim for race discrimination under a hostile work environment theory by alleging: (1) she experienced unwelcome harassment; (2) the harassment was based on race; (3) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere; and (4) there is some basis for imposing liability on the employer. *Bass v. E.I. DuPont de Nemours & Co.,* 324 F.3d 761, 765 (4th Cir.2003), *cert. denied,* 540 U.S. 940, 124 S.Ct. 301, 157 L.Ed.2d 253 (2003). "[N]ot all workplace conduct that may be described as 'harassment' affects a 'term, condition, or privilege of employment' within the meaning of Title VII." *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 67 (1986). Racial harassment in the workplace is actionable only where it is "sufficiently severe or pervasive 'to alter the conditions of employment and create an abusive working environment.'" *Id.* "Unlike other, more direct and discrete unlawful employment practices, hostile work environments generally result only after an accumulation of discrete instances of harassment." *Jordan v. Alternative Res. Corp.,* 458 F.3d 332, 339 (4th Cir.2006) (citation omitted); *See Causey v. Balog,* 162 F.3d 795, 801 (4th Cir.1998) (finding the harassment must be "sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere"). Again, a plaintiff need not plead the elements

11

of a prima facie case to withstand a motion to dismiss.   *McCleary-Evans*, 780 F.3d at 585 (citation omitted).

A court determines whether conduct rises to this level by examining the totality of the circumstances.   Specifically, the court should consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *E.E.O.C. v. Sunbelt Rentals, Inc.,* 521 F.3d 306, 315 (4th Cir. 2008) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)).   While an isolated instance of harassment may, if sufficiently severe, be sufficient to engender a hostile work environment, such an environment "generally result[s] only after an accumulation of discrete instances of harassment." *Boyer-Liberto v. Fonteinebleau Corp.*, 786 F.3d 264, 273 (4th Cir. 2015) (en banc) (citing *Jordan v. Alt. Res. Corp.*, 458 F.3d 332, 339 (4th Cir. 2006) (internal quotation marks omitted)).

Plaintiff sprinkles the phrase "hostile work environment" at random throughout his pleading, but never alleges even one instance of outright harassment.   Inasmuch as he alleges that the Library contributed to a hostile work environment by imposing a racially discriminatory computer policy, (ECF No. 18 at 3), this is not the type of conduct that typically gives rise to a hostile work environment claim.   Such a claim generally requires evidence of a workplace "permeated with 'discriminatory intimidation, ridicule, [or] insult,'" *Harris*, 510 U.S. at 21 (citation omitted), and a limited denial of computer privileges, even if unfair, does not readily fit within this standard.   Further, even if this conduct could be appropriately termed "harassment," the Court cannot infer from these facts that the conduct was either severe or pervasive enough to be actionable.   *Boyer-Liberto*, 786 F.3d at 273.   Plaintiff fails to describe how the Library's new computer policy presented a change from previous practice, and without allegations detailing how

12

Plaintiff was affected by the change, the Court can only speculate as to how the new policy altered Plaintiff's expectations or otherwise interfered with his workday.

The Amended Complaint reveals no other instance of intimidation or ridicule that could reasonably give rise to a hostile work environment claim.   Plaintiff's hostile work environment claim must therefore be **DISMISSED**.

### C.   Retaliation

Title VII prohibits retaliation against an employee who has "opposed any practice made an unlawful employment practice" under Title VII.   42 U.S.C. § 2000e–3(a).   In this context, the Supreme Court has defined "oppose" broadly, according to its plain meaning: "to resist or antagonize . . . ; to contend against; to confront; resist; withstand, . . . to be hostile or adverse to, as in opinion."   *Crawford v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, 555 U.S. 271, 276 (2009) (internal citations omitted) (quoting Webster's New International Dictionary 1710 (2d ed. 1958); Random House Dictionary of the English Language 1359 (2d ed.1987)).   "When an employee communicates to her employer a belief that the employer has engaged in . . . a form of employment discrimination, that communication virtually always constitutes the employee's *opposition* to the activity."   *Crawford,* 555 U.S. at 276, (internal quotation marks and citation omitted); *see DeMasters v. Carilion Clinic*, 796 F.3d 409, 416–17 (4th Cir. 2015) (noting that *Crawford* does not set an onerous threshold for oppositional conduct under Title VII).

Thus, to establish a *prima facie* case of retaliation, a plaintiff must prove that (1) he engaged in protected activity; (2) his employer acted adversely against him, and (3) his protected activity was causally connected to his employer's adverse action.   *Rhoads v. F.D.I.C.*, 257 F.3d 373, 392 (4th Cir. 2001); *also see Dowe v. Total Action Against Poverty in Roanoke Valley,* 145 F.3d 653, 656 (4th Cir. 1998).   "There is no question that directly complaining to an employer about a

13

discriminatory policy is sufficient to constitute 'protected activity' for purposes of his Title VII . . . claim." *Viscecchia v. Alrose Allegria LLC*, 117 F. Supp. 3d 243, 256 (E.D.N.Y. 2015).   To fall under Title VII's antiretaliation provision, the employer action must be "materially adverse to a reasonable employee." *Burlington N. and Santa Fe R.R. Co. v. White*, 548 U.S. 53, 54 (2006).

While the allegations surrounding Plaintiff's seven-day suspension did not support a substantive discrimination claim, they do state a plausible claim for retaliation.   Plaintiff alleges that he was retaliated against for opposing a computer policy, described *supra* Section III.A, that discriminated among employees on the basis of their race.   With regard to that policy, Plaintiff claims that his manager, Dana Smook, announced during a staff meeting that "the 2 whites could use the computers without restriction because of events and programs and 3 blacks were restricted."   (ECF No. 18 at 3.)   He avers that he complained to Ms. Smook during the staff meeting that the computer policy "was unfair and discriminatory against us 3 black coworkers." (*Id.* at 4.)   Plaintiff was asked to leave the meeting and the human resources manager informed him of his suspension immediately afterward.   These allegations are sufficient to state a plausible claim for retaliation, specifically, that Plaintiff engaged in protected activity and suffered an adverse employment action—the suspension—as a direct result.[4]   *See Burlington*, 548 U.S. at 54 (upholding jury's finding that employee's 37-day suspension without pay was materially adverse

---

[4] Again, the Court notes that a suspension that does not produce a material consequence to the employee may not be an adverse employment action.  *See Burlington*, 548 U.S. at 68, (reasoning that the statutory significance of an employer's action turns on the presence of "material consequences" as opposed to "trivial harms"); *Von Gunten v. Maryland*, 243 F.3d 858, 869 (4th Cir. 2001) (finding that "placing [an employee] on administrative leave with pay for a short time to allow investigation of [a] matter" was not an adverse employment action).   The Court lacks many details regarding the terms of the suspension that would affect its materiality.   For purposes of the Motion to Dismiss, the Court finds only that Plaintiff's suspension could constitute an adverse employment action under Title VII.   Whether the suspension in fact constitutes an adverse employment practice in his case has yet to be determined.

in retaliation context); *LeMaire v. La. Dep't of Transp. & Dev.*, 480 F.3d 383, 390 (5th Cir. 2007) (finding two-day suspension without pay a retaliatory action); *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 190 (4th Cir. 2001) (finding that when likened to a suspension, an employee lockout could be an adverse employment action); *Parkinson v. Anne Arundel Med. Ctr., Inc.*, 214 F. Supp.2d 511, 518 (D. Md. 2002) ("Plaintiff's one-day, unpaid suspension . . . could constitute an adverse employment action."). Assuming the truth of those allegations for the time being, Plaintiff's retaliation claim based on the suspension must be allowed to proceed.

Plaintiff's other retaliation claims are not as successful. Plaintiff alleges generally that at some point during the course of his employment, "[s]taff members began neglecting their work duties and leaving their books for me to shelf." (ECF No. 18 at 3.) He complained about his coworkers to his manager, who "agreed to speak with staff members but nothing changed." (*Id.*) Plaintiff claims that in retaliation for these complaints, he was denied "desk duty." (*Id.*) These allegations fail to state a claim for Title VII retaliation because first, the denial of desk duty does not appear to be an action materially affecting a term, condition, or privilege of his employment, and second, Plaintiff does not identify any protected activity precipitating the allegedly adverse employment action.[5] Generally, changes to an employee's tasks are not an adverse employment action without evidence that the changes affected the employee's pay, benefits, or the like. *See*

---

[5] In connection with his allegations concerning retaliation in the denial of desk duty, Plaintiff states that several "minority patrons and one blind person" had complained that they had returned books that were never credited to their accounts. If true, Plaintiff's complaints to Library management on behalf of these patrons do not constitute protected activity because the employment rights of the patrons were not violated. *See Silver v. KCA, Inc.*, 586 F.2d 138, 141 (9th Cir. 1978) ("By the terms of the statute . . . not every act by an employee in opposition to racial discrimination is protected. The opposition must be directed at an unlawful employment practice of an employer[.]"; *DeMoss v. Norwalk Bd. of Educ.*, 21 F. Supp.3d 154 (D. Conn. 2014) (finding that a teacher did not engage in protected activity by protesting a policy that allegedly discriminated against students on the basis of racial discrimination since school's policy was not an employment practice under Title VII).

*Boone v. Goldin*, 178 F.3d 253, 256–57 (4th Cir. 1999) ("Absent any decrease in compensation, job title, level of responsibility, or opportunity for promotion, reassignment to a new position . . . does not constitute an adverse employment action.").   Far from alleging that the denial of desk duty detrimentally affected his employment, Plaintiff does not even explain why desk duty would be desirable to an average employee.

He further alleges that upon his return from work following his suspension, "I was given 3wks. [sic] [e]xtra work pulling discards after suspension: Discards were only to be pulled by L2 full time workers and m[anagers].   I was L1 Part Time not qualified (RETALIATION)."   (ECF No. 18 at 4.)   Though this conduct on the part of the Library appears to have occurred close in time to Plaintiff's alleged participation in protected activity, Plaintiff does not allege facts demonstrating that "extra work pulling discards" could constitute an adverse employment action. As such, Plaintiff's retaliation claim associated with the "discards" is fatally deficient.

Plaintiff also alleges "retaliation in work schedule."   (ECF No. 18 at 5.)   He claims that after his return following his suspension, he was "treated unfairly" by not being allowed to work during opening or closing hours.   These facts fail to state a claim for retaliation.   In the absence of circumstances demonstrating their significance to the individual employee, changes to an employee's work schedule generally are not considered retaliatory acts under Title VII.   *See Edmonson v. Potter*, 118 F.3d App'x 726, 729 (4th Cir. 2004) (where employee requested temporary schedule change merely for personal convenience, employer's denial of the request was not an adverse employment action); *Benningfield v. City of Houston*, 157 F.3d 369, 377 (5th Cir. 1998) ("Merely changing [an employee's] hours, without more, does not constitute an adverse employment action."); *but see Burlington*, 548 U.S. at 69 ("A schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young

16

mother with school-age children."). While it is clear that context matters in determining the significance of any given act of alleged retaliation, Plaintiff fails to provide that context. He leaves the Court with no explanation for how any change to his schedule was a materially adverse change to the terms and conditions of his employment.[6] Further, even if the scheduling changes were adverse actions, Plaintiff's retaliation claim is deficient because he provides no allegations linking the action to protected activity. If Plaintiff believes that the Library's scheduling changes were somehow connected to his complaints about the allegedly discriminatory computer policy, he has not alleged as much.

In summary, Plaintiff's retaliation claim based on his seven-day suspension survives the Library's Motion to Dismiss. Plaintiff fails to state a claim for retaliation with regard to the denial of desk duty and the Library's refusal to schedule him during opening and closing hours.

### D. Intentional Infliction of Emotional Distress

Under West Virginia law, an intentional infliction of emotional distress contains four elements. To survive a motion to dismiss, the plaintiff must plausibly allege the following:

> (1) that the defendant's conduct was atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency; (2) that the defendant acted with the intent to inflict emotional distress, or acted recklessly when it was certain or substantially certain emotional distress would result from his conduct; (3) that the actions of the defendant caused the plaintiff to suffer emotional distress; and, (4) that the emotional distress suffered by the plaintiff was so severe that no reasonable person could be expected to endure it.

Syl. Pt. 3, *Travis v. Alcon Laboratories, Inc.*, 504 S.E.2d 419 (W. Va. 1998).

In support of his claim for "Intentional Mental Anguish," Plaintiff alleges that on January

---

[6] As Plaintiff does not describe his normal work schedule, it is impossible for the Court to tell whether the Library allegedly prevented him from working his routine hours or, rather, whether the Library merely denied a request by Plaintiff for a specific schedule change.

19, 2013, the front page of the local Sunday newspaper displayed at the Library featured an article about an unresolved murder and included a picture of the crime scene where the victim's body had been recovered thirteen years earlier.[7]   Plaintiff claims that the murder victim was his cousin with whom he shared a close relationship.   Because the Sunday newspaper would be displayed all week, Plaintiff explained to his coworkers that it was "very hurtful" to see the crime scene each day as he reported to work.   (ECF No. 18 at 5.)   The following Sunday, the Library did not receive a Sunday newspaper to replace the newspaper from the week prior.   Plaintiff alleges that in normal circumstances, the Library management would have contacted the publisher to request a replacement newspaper.   On this day, however, "[t]he m[anagers] never ordered one."   Plaintiff continues: "Both m[anagers] [k]new the photo on the front page of that Sunday Paper was emotional and disturbing to me and they intentionally refused to get another Sunday Paper that would sit on top of and cover the old Sunday paper."[8]   (*Id.*)

   Plaintiff has not alleged facts that could reasonably be regarded as so extreme and outrageous as to constitute the intentional infliction of emotional distress.   At most, his coworkers' alleged refusal to replace the newspaper with the traumatic story was insensitive and unkind.   Mere hurt feelings simply do not suffice.   *See Lee v. City of S. Charleston*, 668 F. Supp. 2d 763, 778 (S.D. W. Va. 2009) (explaining that bad manners and hurt feelings do not qualify as

---

[7] January 19, 2013, was a Saturday.   The Court assumes Plaintiff's allegations relate to the Sunday newspaper published on January 20, 2013.

[8] These facts follow after a numbered heading stating "Intentional Mental Anguish," and it thus appears to the Court that Plaintiff attempts to state a claim for something akin to intentional infliction of emotional distress.   After the factual description, however, Plaintiff also writes in parentheses "(Retaliation—Hostile Work Envirement (sic))."   If Plaintiff intends to state a retaliation claim based on these facts, he fails to allege either an adverse employment action or engagement in protected activity.   To the extent he offers these facts in support of a hostile work environment claim, they do not serve as the kind of harassment needed to state a cause of action.

18

"outrageous conduct" so as to be actionable under an intentional infliction of emotional distress theory) (citation omitted); *Travis*, 504 S.E.2d at 426 ("There is no occasion for the law to intervene in every case where some one's feelings are hurt." (quoting *Tanner v. Rite Aid of W. Va., Inc.*, 461 S.E.2d 149, 157 (W. Va. 1995))). There is no indication that Library staff commented to Plaintiff about the news story, much less subjected him to verbal ridicule or harassment over it. The Library does not select the newspaper's content, and if Plaintiff found that content troubling, he could simply have looked away. His "Intentional Mental Anguish" claim, construed as a claim for intentional infliction of emotional distress, will be dismissed.

### E.   Fraud

Federal Rule of Civil Procedure 9(b) sets a high threshold for a plaintiff alleging fraud, stating that "a party must state with particularity the circumstances constituting fraud or mistake." This standard requires a plaintiff to "at a minimum, describe the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *U.S. ex rel. Wilson v. Kellogg, Brown & Root, Inc.*, 525 F.3d 370, 379 (4th Cir. 2008) (quoting *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir.1999)) (internal quotation marks omitted). Stated differently, the plaintiff must describe the "'who, what, when, where, and how' of the alleged fraud." *Id.* (quoting *U.S. ex rel. Willard v. Humana Health Plan of Texas Inc.*, 336 F.3d 375, 384 (5th Cir. 2003)). "[I]n the ordinary case when the claimant has adequate access to the necessary facts, the claimant may not plead fraud on information and belief nor in a vague manner." *Beattie v. Skyline Corp.*, 906 F. Supp. 2d 528, 537 (S.D. W. Va. 2012) (quoting *Moore's Federal Practice and Procedure* § 9.11(1)(b)(i) (2012)) (internal quotation marks omitted).

19

Thus, to survive a motion to dismiss, a plaintiff bringing a common law fraud claim must plead with particularity the following elements: "(1) that the act claimed to be fraudulent was the act of the defendant . . . ; (2) that it was material and false; that plaintiff relied upon it and was justified under the circumstances in relying upon it; and (3) that he was damaged because he relied on it. *Gaddy Eng'g Co. v. Bowles Rice McDavid Graff & Love, LLP*, 746 S.E.2d 568, 576 n. 26 (W. Va. 2013) (citing *Horton v. Tyree*, 139 S.E. 737, 738 (1927)).

Plaintiff fails to plead fraud with requisite specificity.   His claim appears to arise from his objection to a termination report forwarded by the Library to the West Virginia Workers' Compensation Commission.   This claim alleges, in its entirety:

> (8) Fraudulent Report to WV Workers Compensation
> Kanawha [C]ounty Public Library Human resource m[anager] sent a completely fraudulent report describing why I was terminated calling my actions Gross Misconduct filled with total fabrications and manipulations of the true facts.   This fraudulent report caused me hardship and I was denied my unemployment compensation.
> EVIDENCE: CASE NUMBER: R-2013-3355 DOCUMENT

Assuming that Plaintiff's conclusory allegations satisfy the first and third elements of a fraud claim, they offer no support for the second.   Plaintiff makes no attempt to describe these so-called "fabrications," nor does he explain how they deviate from the "true facts."[9]   While Plaintiff suggests that he has documentary evidence to support this claim, he has not presented it for the Court's review.   Thus, the Court has no way to determine the material falsity of any statements contained within the Library's report to the Workers' Compensation Commission, and, as a consequence, cannot assess the sufficiency of his fraud claim.   Plaintiff's fraud claim will be dismissed.

---

[9] It is also unclear how Plaintiff relied on the Library's alleged misrepresentations, as the report in which they were contained was apparently addressed to a government agency.

## IV.    CONCLUSION

For the foregoing reasons, the Court **DECLINES TO ADOPT** the PF&R (ECF No. 32) and **GRANTS IN PART** the Library's Motion to Dismiss (ECF No. 22) as follows.   As to Plaintiff's Title VII claims for discriminatory termination, discriminatory suspension, hostile work environment, and retaliation based on work schedule, denial of desk duty, and "extra work pulling discards," the Motion to Dismiss is **GRANTED**.   The Motion to Dismiss is further **GRANTED** with respect to Plaintiff's common law claims for intentional infliction of emotional distress and fraud.   As to Plaintiff's Title VII claims for discrimination based on the Library's computer policy and retaliatory suspension, the Motion to Dismiss is **DENIED**.   The Court **REREFERS** this action to Magistrate Judge for consideration, *inter alia*, of Plaintiff's Motion for Leave to Amend Complaint (ECF No. 34), and the Library's responsive Motion to Strike (ECF No. 35).

**IT IS SO ORDERED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER:        September 26, 2016

_____
THOMAS E. JOHNSTON
UNITED STATES DISTRICT JUDGE

21